17-1234 Waller v. City and County of Denver. Good morning. My name is Kenneth Padilla. I want to thank the court for giving us the opportunity for to argue this case on behalf of my client Anthony Waller for claims against the City and County of Denver 17-1234 Waller v. City and County of Denver. Mr. Waller was fully shackled, hands, feet and waist appearing in a courtroom inside Denver City Jail facility when he was brutally attacked by Deputy Sheriff Lovinger. Mr. Waller was drugged from the courtroom, bloodied, while Judge Byrd was in the process of responding Mr. Waller's question, which he found to be appropriate and legitimate during his advisement and rights. She got four words out as this occurred, namely to answer his question when she was interrupted. Mr. Waller is dumbfounded and cannot understand why he couldn't proceed with this case against the City and County of Denver for claims of failure to properly train, supervise, investigate and discipline Deputy Sheriffs. The sole issue before this court is what is the appropriate pleading standard for municipal liability in the wake of Bell Atlantic v. Twombly and John Ashcroft and Robert Mueller v. Ickbell. And did plaintiff meet that standard? The Federal Rules of Civil Procedure, Rule 8A2, has not been abrogated by the judicial holding in Ickbell v. Twombly. Rule 8 provides a pleading that states a claim for relief must contain a short and plain statement of the claim. As this very court, Judge McKay, held in Kalik v. United Airlines, any requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules and not by judicial interpretation. You still have to identify policies, right? And you have to identify that those policies were the moving force behind your client's harm. Isn't that correct? That is correct, Judge. Okay. And speaking to the policies that you've identified, why don't you restate those for us now? What policies are you relying on? The policies that we were relying on by the city and county... First of all, the court is quite aware, I'm sure, that it's very difficult for the plaintiffs in these types of cases to identify with absolute specificity all the policies and have that information. Especially with the city and county of Denver, they do not... That is not public information that is given to complainants, to give them to the public, or to be given to their attorneys. The only way you can obtain that information is through the pry bar of discovery. So, we allege, in our complaint, that the policies and customs of the city and county of Denver, that they have failed to properly train police officers, that their training procedure for, excuse me, I said police officers, but deputy sheriffs, were such that they were deficient and did not adequately provide for protection of the inmates in their custody, that they failed to properly supervise the deputy sheriffs in their use of excessive force. Well, they failed to properly investigate and properly discipline. We attached to our... We included in our complaint any public information that we had regarding that, and we also included very specific facts in our complaint about the things that happened with Mr. Waller, including that, and I think it was paragraph 157 of the complaint, where we allege that Deputy Lovinger, ironically, was a person, was a trainer for the city and county of Denver in the use of force. Right now, though, we are not talking about the liability of Deputy Lovinger, right? We're talking about the liability of the city. Right. And Manel makes it clear that there are certain requirements, as onerous as they may be, that you're required to meet in order to impose liability on the city. Isn't that a... I wasn't... In regard to Deputy Lovinger, the reason that's important, Judge, because that shows that we have a judgment against Deputy Lovinger. We've proven that there was a constitutional violation. We had to go to trial in regard to that. But Deputy Lovinger is a prime example, and we showed him that he is a trainer, and he's the one that used this excessive force. Now, it's not part of this complaint, Judge, but just to give you an example, during the trial, Mr. Deputy Lovinger claimed that he was... That's the way he was trained, to act the way he did in the courtroom. He tried to use that as a defense. And there was other things that came out during the discovery. But, of course, we didn't have those. So, if you shut the door ahead of time, all that is really required, as Kayleigh has indicated, is to give fair notice to the city of what you intend to try to prove. And we provided, in the OIM reports, which were not discussed in any bit by the magistrate judge or the judge in summarily adopting the recommendation, all the OIM reports. And we submitted those in our complaint. Those OIM reports are the Office of Independent Monitor. It's the agency empowered by the city and county of Denver to investigate its own deputy sheriffs and police officers. And they put forth, and we set that forth in paragraph 71 to 79 of our complaint. And those are very detailed. And, yes, detailed. But what do they establish? I mean, the OIM reports go to the question of whether there was a policy of not acting on prisoner grievances of misconduct. Isn't that right? Not entirely, no. What else is it, then? They also went into the idea that not only that the misconduct was compromised, but that also, on paragraph 75, found that from January 1, 2011 to January 30, 2013, only 6 percent of inmate allegations of serious misconduct were investigated by IAB, thereby failing to impose discipline. I'm sorry, go ahead. I was just going to say, I'm not following the causation. Let's just focus on causation, because you have to establish that with respect to each of your four separate municipal liability claims. And I don't see it anywhere. I don't see, for instance, assuming those reports were all properly attached to your complaint and considered, where is the causation that shows that this, what we would call an unprovoked attack against a shackled prisoner, somehow could have been caused by the failure to investigate prisoner grievances or the failure to train? I'm just not seeing the causation here. And I don't see that you allege causation with respect to any of the claims. The causation requirement could be better served, as I've indicated, through ability to conduct discovery and to determine that. But you've got to allege. I've gone through a trial now, and I know that Deputy Lovinger claims that he did this because that's the way he was trained to act. But of course, what evidence was there that Deputy Lovinger was trained to unprovoked attack a defenseless prisoner? What evidence was there that that was part of his training? What did you allege in your petition or in your complaint? We allege in our complaint that Deputy Lovinger and, well, the city and county of Denver had trained his police officers in the use of force. They had a specialized unit of deputy sheriffs, which we found out in police department, SCAT unit, to tactical, and that he was the head of that, and that he trained these people by himself. Now, that's the type of training that the city and county of Denver. We didn't have the opportunity to determine that, but we alleged both as much as we could in the complaint. We also gave specific instances of cases against the Denver Sheriff's Department. I think there's about 12 paragraphs, maybe less than that, Judge, 10 or less paragraphs of specific instances in which deputy sheriffs had used force against prisoners before, resulting in very serious injuries and death, and that there was a continuing custom and policy of the city and county of Denver to fail to investigate those. Now, you create, as several of these cases that we've cited in our brief, you create a culture within the department in which the deputy sheriffs know that they can get away with this blatant, unprovoked attack, even when they know that cameras are rolling in the courtroom. And they create this culture by not properly disciplining deputy sheriffs, and it's a common logical conclusion from that that deputy sheriffs know they can get away with it. And in fact, Lovinger did. He got away with it. He didn't get fired from his job. You beat a man, and this is the sort of thing that occurs in totalitarian countries. You beat a man for talking in the courtroom and answering the judge's question, and then to reinforce that, you tell the man, you can't investigate this as to why the municipality that hired this man also committed a constitutional violation because we're going to dismiss your case because you haven't set forth all the facts necessary to prove this case. The standard is plausibility, not probability of success. So we did the best we can, and that's the way plaintiffs are in these types of cases. If you want to, the promise of 1983 in litigation to create private attorney generals to come forth in the private sector and submit these cases to vote their time and money and resources, and then it's becoming a favored pool of governments and corporations in employment cases to use 12b motions to dismiss. And they're the ones that have all this information. That needs to be paramount in mind. And I hope I've answered the court's question. I guess I'd like to reserve my time for a rebuttal. That's fine. Yes. Thank you. Thank you. Good morning. May it please the court. My name is David Cooperstein. I'm here on behalf of Defendant Appali, the city and county of Denver. Plaintiff's complaint in this case describes a handful of unrelated incidents and attempts to connect them to the incident involving Mr. Waller using only conclusory allegations of municipal liability. The result urged by plaintiff in this appeal would require the court to commit two legal errors. First, to disregard the context-specific plausibility inquiry required by Iqbal, and second, to ignore the elements of the municipal liability theories plaintiff seeks to assert and instead impose respondeat superior liability in substance, if not in name. The district court here determined that the complaint failed to set forth facts capable of supporting a reasonable inference that plaintiff's injury was caused by any municipal custom or policy. The only facts level that Denver in the complaint concern a handful of excessive force incidents spanning a seven-year period, and the report of the independent monitor issued about a year after this incident. Is it true, as counsel said, that the deputy said that his behavior on this occasion was the way he was trained, that he was actually trained to do that? Not specifically, Your Honor. In the deposition testimony, again, this is outside the record on appeal, but in the deposition testimony, the trial transcript hasn't been ordered, so I haven't had the benefit of reviewing that for the court, and I can't make that work. Could it reasonably be construed to say that he was trained to behave as he did on that occasion? Absolutely not, Your Honor. The Mr. Lovinger's explanation, and it should be mentioned, Mr. Lovinger is no longer with DSD, essentially because of this case. This ended his career. But he believed he acted appropriately. He perceived a threat that he believed Mr. Lovinger, I'm sorry, Mr. Waller posed. The DSD and Denver's supervisors reviewing the incident did not see that threat. So I would answer that question no. And the proper way, I think more importantly, after having taken Mr. Lovinger's deposition, received discovery in this case, a plaintiff's attorney easily could have pursued Rule 15, moved to amend the complaint, reassert his claims, his claims weren't dismissed with prejudice, instead of essentially sitting on the claims and then filing this appeal, and then essentially without putting the actual evidence before the district court or this court, give a summary of what he thinks the evidence was. That's not procedurally proper, and there's no way for this court to infer any unconstitutional conduct on behalf of Denver, based only on counsel's recapitulation of evidence not before this court. So if I can turn to the instances of misconduct which plaintiff says created this culture of excessive force. In reality, if the court looks at the complaint, plaintiff describes seven incidents over a seven-year period, and remarkably, plaintiff either concedes or is silent as to the fact that in six of those seven incidents, they were both investigated and discipline was in fact imposed on the involved deputies. So the suggestion that deputies based on those incidents thought they could act with impunity is not a reasonable inference that can be drawn from the complaint. What about the OIM report? So the OIM report issued subsequent to the incident is unfortunately not actually attached to the complaint, but fortunately is described in great detail in the 300 pages of consultant reports the plaintiff does attach to the record on appeal. That report did not find that any instances of excessive force described in inmate grievances went uninvestigated or that any instances of excessive force went undisciplined. Rather, that report indicated that instead of investigating those grievances through the chain of command and then referring them to internal affairs, if they felt they met a threshold where misconduct could be shown, that IA should be doing those investigations, internal affairs should be doing the entirety of those investigations. It is of no constitutional significance whatsoever. The Constitution does not require that investigations be performed in any specific way by internal affairs as opposed to the chain of command. In essence, that would be a prophylactic measure above and beyond what the Constitution requires and therefore cannot be a basis for liability. Well, I haven't looked at it recently. That wasn't my understanding of the report. I thought the thrust of the report was that there was a tendency by the City and County of Denver and in particular the Sheriff's Department to look away from when these grievances were filed. Am I misunderstanding that? Was this just a structural issue about who was looking at it? Yes, Your Honor. I would respectfully suggest you are missing the thrust of the report. Within the appellate record, I can point the Court to I believe it was pages 246 through about 260 where the consultants kind of described what the procedure was. But the procedure that the OIM took issue with is that initially when a grievance was filed that would be looked at by supervising sergeants who don't have access to video within the jail, they would have to make an initial decision based on limited evidence which the OIM did not like. But even though they make their initial decision, regardless of whether they think the conduct of the subject deputy was appropriate or inappropriate, it then would go up the chain of command to the captains who had access to video evidence, would compare the employee reports to the video. If it didn't match or the video showed something inappropriate, then the case would go to IA. OIM felt that it would be much more robust if IA did every investigation from the get-go. And quite apart from the report itself, I mean, aren't we looking at the statements of fact that are pled in the complaint relative to the report? Yes, Your Honor. Although because the complaint does explicitly reference and incorporate the report, it's publicly available, the court I don't believe would be necessarily stepping out of line or abusing discretion by doing that, by looking at the actual report. However, plaintiff's allegations are really most notable for what they don't say. I believe they begin in paragraph 70 of the amended complaint, and they say what I'm telling the court essentially, that the grievances weren't investigated by IAB. Not that they weren't investigated, and it's an artful bit of pleading from plaintiff's counsel, but it doesn't allege what needs to be alleged. So you're saying, for instance, in paragraph 71 where we say, the OIM found that inmate grievances that allege serious deputy misconduct are often not referred to or investigated by DSD internal affairs? Yes. As required by DSD policy, and therefore no discipline is imposed. That seems to be taking it a step further, which is because there's no investigation by whoever, there's no discipline imposed. That seems to be alleging there's no investigation. And that is essentially, I believe it's pled in a way to essentially hide the ball that, and OIM did feel that more meaningful discipline would be imposed if IA did all of the investigations. That's in the report. But it, again, is not of constitutional significance. The Constitution doesn't require that every investigation be utterly exhaustive and perfect, that discipline be perfect in every case, only that a reasonable essentially framework be imposed so that the misemissal employees comply with the Constitution. Yes, I understand that. But by incorporating the report, going to your point earlier, I mean at least by virtue of pleading regarding the report, if we were to look at that report, would the report indicate that, in fact, apart from whether they followed the policy they should have followed, that there were investigations conducted and discipline meted out? Because the question, what is alluded to by the pleading is the culture point, that there was a blind eye turn to acts of serious misconduct, and consequently Officer Lovinger figured I could do anything, even in court, and nothing would happen to me. So go talk to me about that point. I mean, quite apart from the structural notion of who did the investigation, is it in fact the case per paragraph 71 that no discipline was imposed? Again, no, Your Honor. It was not, and I don't believe the OIM report in substance will say, it won't identify even a single case where DSD employees used excessive force and no discipline was imposed. It's the structural fact, Your Honor, and, in fact, the other allegations in the complaint would lead anyone to the opposite conclusion, that with the seven instances described by plaintiff, six of those seven resulted in discipline, and plaintiff essentially says in the seventh that even though it was investigated, discipline should have been imposed. In other words, he disagrees with the ultimate conclusion of the department. However, to disagree with the conclusion of the results of investigation in a single case is far from suggesting the widespread practice such that it has force of law of tolerating, condoning excessive force, and it shouldn't escape the court that this incident was, in fact, investigated and discipline was, in fact, imposed. So to the extent that there is a possibility that this culture of excessive force existed, the complaint is only consistent with that being a mere theoretical possibility. It doesn't cross the threshold of Iqbal of suggesting that such is plausible and not merely possible. The fact that the OIM report was issued after the event here does not render it irrelevant to our consideration of this matter, right? I agree with that. Not irrelevant. However, deliberate indifference requires actual or constructive notice, so this wouldn't really support the deliberate indifference aspect, but it would go to whether a culture of failure to investigate. Well, that in itself could go to deliberate indifference. There was, in fact, a de facto policy of turning the other way. I mean, if the report spans the period at issue here, whether the report was issued or not, we're not talking about notice of the report. We're talking about the fact that they had noticed that the conduct revealed in the report took place, right? I would say yes and no, Your Honor. Yes, it could go towards deliberate indifference, only if truly there were instances of excessive force going uninvestigated or undisciplined, which the report doesn't substantiate. Okay, well, that goes with the content of the report. I'm just talking about whether we can look at the report and the value of what is communicated in the report in us evaluating deliberate indifference. That's quite apart from whether it actually shows deliberate indifference. Am I? Yes, Your Honor. And I would say that the timeline is not as potent as if it had preceded the incident involving Mr. Waller. But I'm sure if you're something about. If the report had been out preceding the event of Mr. Waller, not only would we have had documented instances, but they would have had the report. Yes, Your Honor. Okay. And been able to act upon it. But I think this leads to another issue. Just the fact that Denver has an Office of the Independent Monitor that is empowered to criticize its officers, its law enforcement operations, and issue these reports and publicly issue them, is itself an act contrary to deliberate indifference. And again, I just want to go back to Your Honor suggesting that OIM is saying Denver is turning a blind eye to excessive force. To put that into context, OIM's findings are that if IA automatically, DSDIA, automatically investigates any complaint brought to IA's attention directly by an inmate, inmate's family member, as occurred in this case via email, or the independent monitor. So if somebody wishes to have an IA investigation conducted, as opposed to a chain of command, throughout the relevant time period, that was very easily accomplished through either the Office of the Independent Monitor or directly through DSD's IA, through an email, a phone call, a written letter. It was very easy to do. So even if the court were to find that some grievances weren't adequately investigated, I don't think that goes anywhere near the level of rising to the level of saying a blind eye was turned to complaints of excessive force. There were many avenues which to get an IA investigation. If a formal investigation was indeed what anyone, the complainant, their family, friends, constituents wanted. How long did this investigation take on this incident? This one, I believe, took over a year, but there were also several appeals after discipline was imposed. So the full timeline was quite lengthy. However, within the materials submitted by plaintiffs in the consultant reports, there is detailed information about the timelines of reports and the average time of investigations, and that DSD had essentially cut that timeline consistently to a point where it was within whatever everyone wanted the target to be, the consultants and OIM. How long was it before he was disciplined for this? Your Honor, I'm not entirely sure, Your Honor. What's your view on these consultant reports? I'm not talking about the OIM report. I'm talking about those two reports. I mean, are they within the scope of our consideration of this matter? No, Your Honor. They're not within the four corners of the complaint, and they're not referred to in the complaint. Plaintiff had a very viable avenue of putting them properly before the court, which would have been a motion for leave to amend pursuant to Rule 15, and this touches on an argument made by plaintiff's counsel, that he learned of all of these supposedly damning facts during discovery for municipal liability. Rather than wait for this appeal, plaintiffs could have moved under Rule 15 to incorporate whatever facts he learned, including those consultant reports, before we got to this point of instead of just saying appealing, throwing them in the appellate record and saying, Your Honors, please consider these reports that are not referenced to, described, or alluded to in any way in the complaint. So, no, the court shouldn't consider them under Rule 12b-6 and Rule 8, but nonetheless they don't fill in the blanks in plaintiff's complaint in any meaningful way. In fact, they undermine the complaint further. The ultimate conclusion of the consultants with respect to force generally was that DSD's policies and training met with industry standards but should include more robust safeguards, which would essentially enable officers to avoid using force even where it would be reasonable and appropriate. In other words, additional prophylactic measures aimed at reducing force incidents well beyond what the Constitution requires. Okay, your time is up. Thank you very much. Thank you very much. Could you give him an additional 30 minutes? I mean 30, not minutes, seconds. Let's be clear. Thank you. We haven't touched on the OIR reports and the Hillard-Heinz reports that came out that the Denver paid over a million dollars for these reports to study the Denver Sheriff's Department. First of all, the timeline of those reports that shows in those findings covered the time period relevant in this case, 2011 to 2013 with some of the data they used. You're talking about the – 2012. Can I ask a question? Oh, I'm sorry, Judge. You're talking about the consultant reports, right, those two consultant reports? Yes, the OIR and Hillard-Heinz reports. Okay, and those reports were not talked about in your complaint. They were not released at the time of the complaint. That goes to the point of amendment. The point is, why are they relevant at all in our consideration of this matter since this was a 12b6 and we're looking at the complaint and the procedure would not allow us to consider those, would it? Yes, they were submitted to the district court. Most fortunately, they were released four days prior to our response to the 12b motion. So they were submitted to the court in our objections to the magistrate's opinion. That's what I thought. And that's – there are two problems with that. One, the fact that you submit them to the court but they're not in the complaint doesn't change the fact they're not in the complaint. And what we're supposed to be looking at is what's in the complaint and what's incorporated in the complaint. One problem. Second problem, isn't there a lot of law that says that we aren't supposed to consider something that was not before the magistrate that ruled? I mean, this – you put them in the objections. The magistrate didn't have an opportunity to consider these, did he? He or she? Under Rule 72, the court has that opportunity. The court can consider completely entirely new evidence on a Rule 72 objection. It can consider anything it wants to at that time. The judge, as has been pointed out already, the whole – this whole process had already taken two years. We were two years past the time period. We didn't get – we couldn't have amended anything because the IAB – I mean, the Deputy Sheriff's Department and their investigation would not reveal any documents or records regarding their investigation until it had been completed.  This is a case in which it's videotaped. The judge sitting in the case reports this conduct to the deputy sheriff's – Counsel, your time is up. Thank you. I appreciate it. Thank you for your argument. Thank you both. Case is submitted. Thank you.